

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00140-CR
No. 02-20-00149-CR

———————————————————

JAMES CALVIN MASSEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court Nos. 1572638D, 1632168D

Before Kerr, Birdwell, and Bassel, JJ.
Opinion by Justice Birdwell

## OPINION

The trial court found that an officer's frisk of appellant James Calvin Massey was not supported by reasonable suspicion. But the court nonetheless concluded that the drug evidence should not be suppressed for three reasons.

First, it found that Massey consented to the frisk. But Massey did no more than briefly acquiesce to the officer's command to turn around, and he began a struggle almost as soon as the search began. No reasonable trier of fact could find that this amounted to consent. The frisk was an illegal search.

Second, the trial court concluded that the taint of any illegality was attenuated when Massey committed criminal offenses after the frisk. We hold that Massey's alleged offenses, petty and predictable as they were, do not attenuate the taint of the illegal frisk.

Third, the trial court concluded that the officer found the drugs in plain view after Massey discarded them during the detention. But the officer violated the Fourth Amendment en route to that juncture. The State therefore may not avail itself of the plain-view doctrine.

So holding, we reverse and remand.

## I.    BACKGROUND

In 2018, Massey was indicted for possession of a controlled substance. He pleaded guilty and received eight years of deferred adjudication.

At around 11 A.M. on February 16, 2020, Officer Richard Lukowsky was patrolling the streets of Azle when he observed Massey driving a truck without a registration sticker. Officer Lukowsky pursued the truck as it pulled into a gas station. Officer Lukowsky was concerned for his safety; he associated that particular gas station with drug trafficking because police had made several felony drug arrests there.

Massey was standing at the front door of the closed gas station when Officer Lukowsky turned on his police lights and beckoned him over. Officer Lukowsky asked Massey if he had any weapons, and Massey said no. Officer Lukowsky requested Massey's driver's license. Massey gave him permission to retrieve it from the truck. Massey told Officer Lukowsky about his job and explained that he had tried to pay for a registration sticker but that he did not have enough money. Massey's hands were shaking, and he appeared nervous to Officer Lukowsky, though he was cooperative and respectful. It was daylight, and the lot was empty except for the two men. Officer Lukowsky saw nothing that would indicate the presence of a weapon.

Still, Officer Lukowsky told Massey to turn around so that Officer Lukowsky could pat him down, and Massey turned around and raised his arms slightly. But as Officer Lukowsky started patting down his right pocket, Massey slipped his hand into his left pocket. Officer Lukowsky grabbed Massey's left arm and told him not to reach for his pocket. Massey strained against Officer Lukowsky's grip. Massey then ripped away from Officer Lukowsky and turned to face him. Officer Lukowsky called for backup. When Massey again reached for his pocket, Officer Lukowsky drew his gun.

3

Massey pulled his keys out of his pocket and dropped them on the ground. Officer Lukowsky shouted at him to turn and put his hands behind his back. Massey turned but began walking away, saying that if Officer Lukowsky was going to shoot him, he should go ahead. Officer Lukowsky drew a taser and screamed at Massey to stop. Massey slid behind a metal air compressor and began to fish in his pocket once more, obscured from Officer Lukowsky's view. Officer Lukowsky circled behind him and tased him in the back, and Massey crumpled. He was handcuffed and searched, and within moments, Officer Lukowsky discovered a small plastic bag of methamphetamine on the ground by the air compressor, where Massey had just stood. Before Officer Lukowsky tased Massey, there was no methamphetamine on the ground. Massey was arrested.

The State moved to adjudicate Massey's guilt for the 2018 possession charge. It was alleged that Massey had breached the terms of his community supervision by committing felony drug possession and by failing to report to the probation department.

Massey moved to suppress the drug evidence. Among his arguments for suppression was his theory that the arresting officer did not have reasonable suspicion that Massey was armed and dangerous, as is required to justify a protective frisk. Massey contended that because the discovery of the drugs flowed from an illegal frisk and Massey's reaction to that frisk, the drugs should be suppressed as the fruit of the poisonous tree.

4

After hearing the evidence, the trial court denied suppression. The court reasoned that Massey's own independent actions, which bordered on a resisting offense, disrupted the causative flow from the frisk to the discovery of the methamphetamine, and his actions thus attenuated the taint of a potentially illegal frisk. "[W]hether the search was legal or illegal," the trial court concluded, "Mr. Massey did not have the right to resist in the manner that is shown on the video, so I'm going to deny the motion to suppress on that basis." After finding that Massey violated the terms of his probation, the trial court adjudicated his guilt and sentenced him to five years' confinement.

Separately, Massey was indicted for possession of a controlled substance. After his motion to suppress was denied, he pleaded guilty and was sentenced to five years' confinement to run concurrently with his other sentence. Massey appealed both convictions.

Before this court, the State argued for the first time that Massey consented to the search when he complied with Officer Lukowsky's instructions to turn around and submit to a protective frisk. On our own motion, we abated the case and remanded it for the trial court to prepare written findings of fact and conclusions of law with respect to consent and the other issues raised on appeal.[1]

---

[1]*See Meekins v. State*, 340 S.W.3d 454, 465 (Tex. Crim. App. 2011) ("[A]ppellate courts should have the trial judge's findings of fact before disagreeing with that judge's ruling on a motion to suppress.").

The trial court approved the State's proposed findings of fact and conclusions of law. In them, the trial court found that Officer Lukowsky did not have reasonable suspicion to frisk Massey, but that the protective frisk was nonetheless justified by Massey's consent to the search. The trial court further concluded that even if the frisk were illegal, the taint from the illegality was attenuated when Massey resisted the search. Finally, the trial court concluded that even if the taint were not attenuated, the illegality would be immaterial because the drug evidence was not obtained as a result of the frisk, but by the discovery of the drugs in plain sight after Massey discarded them.

With the trial court's findings and conclusions in hand, we now proceed to evaluate Massey's issues on appeal.

## II. STANDARD OF REVIEW

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact

6

questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling

de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

Even if the trial court gave the wrong reason for its ruling, we must uphold the ruling if it is both supported by the record and correct under any applicable legal theory. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *State v. Martinez*, 569 S.W.3d 621, 623–24 (Tex. Crim. App. 2019). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Id.* at 624.

## III.   LEGALITY OF THE DETENTION

Massey does not dispute that Officer Lukowsky was initially justified in detaining him for a traffic offense. However, Massey insists that Officer Lukowsky unlawfully prolonged the detention beyond what was justified by his initial suspicion. According to Massey, Officer Lukowsky engaged in an unlawful fishing expedition for evidence of wrongdoing, so the evidence must be suppressed.

8

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Id.*

The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission, which is to address the traffic violation that warranted the stop and attend to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*, 135 S. Ct. at 1614. The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. *Id.* at 355, 135 S. Ct. at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009)). Once the original purpose for the stop

is exhausted, police may not unnecessarily prolong the detention solely in hopes of finding evidence of some other crime. *Kothe v. State*, 152 S.W.3d 54, 64 (Tex. Crim. App. 2004). The stop may not be used as a fishing expedition for unrelated criminal activity. *Id.*

"But the Supreme Court has expressly rejected placing any rigid time limitations on *Terry* stops . . . ." *Id.* "[I]nstead, the issue is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985)).

Nothing about the detention here suggests that it was unlawfully prolonged by inquiries unrelated to the traffic infraction and public safety. Officer Lukowsky's actions were prompt and tied to the tasks at hand. He approached Massey, explained the reason for the detention, asked for Massey's driver's license, inquired into the reason for the missing registration sticker, and initiated a frisk—all within the first two minutes of the stop. *See Lerma v. State*, 543 S.W.3d 184, 195 (Tex. Crim. App. 2018) (concluding that the detention was not illegally prolonged where the officer took similar actions in the first five minutes of the stop, at which point additional considerations justified further intervention). The next two minutes were spent grappling with Massey, dealing with the apparent threat that he posed, and discovering the methamphetamine. *See id.* When "police are acting in a swiftly developing situation . . . the court should not indulge in unrealistic second-guessing" in determining whether the search was illegally

10

extended. *Sharpe*, 470 U.S. at 686, 105 S. Ct. at 1575. The entire exchange unfolded in four minutes. *See Grandberry v. State*, No. 02-13-00488-CR, 2014 WL 3029045, at *4 (Tex. App.—Fort Worth July 3, 2014, no pet.) (per curiam) (mem. op., not designated for publication) ("Delays of twenty-six minutes or longer have been found reasonable, depending on the balancing of the public interest served by the delay against the appellant's right to be free from arbitrary detentions and intrusions."). Thus, the investigation was not wrongly extended.

## IV. LEGALITY OF THE FRISK

Massey next argues that the protective frisk was illegal. Massey contends that Officer Lukowsky did not have reasonable suspicion to believe that Massey was armed and dangerous, and thus the frisk was not defensible under the Fourth Amendment.

The trial court determined that the frisk was not justified by reasonable suspicion. This determination is well supported by the record. An officer is justified in engaging in a protective frisk if he reasonably suspects that the person who he has lawfully detained is presently armed and dangerous. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016). "The intrusion must be based on specific articulable facts which, in the light of the officer's experience and general knowledge, together with rational inferences from those facts, would reasonably warrant the intrusion." *Id.* In this case, the only articulable facts available to support a belief that Massey was armed and dangerous were that Massey (1) was nervous (2) in an area where there had been drug arrests. *See Wade v. State*, 422 S.W.3d 661, 671 (Tex. Crim. App. 2013) (deeming

11

nervousness "not particularly probative" in evaluating reasonable suspicion); *see also O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000) ("The Supreme Court has been 'careful to maintain' the 'narrow scope' of the pat-down exception." (quoting *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S. Ct. 338, 343 (1979))). There were no signs of a weapon, and Massey was at a safe distance, in broad daylight, without access to his vehicle, respectfully complying with the officer, who was the only other person in the parking lot—an apparently safe situation until the officer grabbed him and drew him close, into a frisk that is now alleged to be illegal. Without any articulable facts reflecting a hazard to the officer, the initiation of the frisk was unsupported by reasonable suspicion.

However, the State maintains that Officer Lukowsky was nonetheless permitted to initiate the protective frisk because Massey consented to it. As the trial court found, when Officer Lukowsky asked Massey to turn around and submit to a pat-down, Massey turned around and raised his arms slightly. According to the State, these gestures signified Massey's consent to the pat-down, as the trial court also found. And as to the fact that Massey began resisting the pat-down a moment after it began, the State contends that this was simply the withdrawal of his consent. Thus, by the State's account, this fleeting consent is enough to justify the initiation of the frisk.

Under the Fourth Amendment, a search conducted without a warrant is per se unreasonable subject only to a few specifically established and well-delineated exceptions. *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). One of those

exceptions is a search conducted with the person's voluntary consent. *Id.* Under Texas law, the State must prove voluntary consent by clear and convincing evidence. *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011). The consent must be shown to be positive and unequivocal, and there must not be any duress or coercion, actual or implied. *Id.* Consent is not established by showing no more than acquiescence to a claim of lawful authority. *Carmouche*, 10 S.W.3d at 331. The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances. *Weaver*, 349 S.W.3d at 526. "Consent to search is not to be lightly inferred." *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985); *Corea v. State*, 52 S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).

A person's consent to a search can be communicated to law enforcement in a variety of ways, including by words, actions, or circumstantial evidence showing implied consent. *Meekins*, 340 S.W.3d at 458. Thus, Texas courts have held that where law enforcement requests consent for a search or otherwise puts the question of consent to the detainee in a way that does not indicate compulsion, a person may answer that question in the affirmative by a gesture indicating that the search is permitted. For instance, in *Kendrick v. State*, the investigating officer "requested appellant's permission to conduct a pat-down," and the court of appeals held that when appellant stood up and raised his hands in response to this question, he thereby indicated his consent to the search. 93 S.W.3d 230, 234 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). Likewise, in *Todd v. State*, the investigating officer asked for permission to search the

13

appellant's vehicle. No. 08-03-00443-CR, 2005 WL 1124262, at *5 (Tex. App.—El Paso May 12, 2005, no pet.) (not designated for publication). The defendant "threw up his arms in the direction of the vehicle," and the appellate court upheld the determination that his gesture communicated a response of consent. *Id.* In *Salinas v. State*, the officer requested permission to perform a pat-down, and the court held that appellant indicated his consent to the search in part by turning his back and raising his hands. No. 13-15-00310-CR, 2016 WL 2747770, at *1, *4 (Tex. App.—Corpus Christi–Edinburg May 5, 2016, no pet.) (mem. op., not designated for publication). In *McAllister v. State*—the case upon which the State principally relies—the driver of a car was arrested, and his passenger asked an officer for a ride to his mother's house. 34 S.W.3d 346, 349–50 (Tex. App.—Texarkana 2000, pet. ref'd). The officer agreed but told the passenger he would have to be patted down before he would be allowed to get in the patrol car. *Id.* at 350. In reply, the passenger "raised his hands to about chest level." *Id.* Because the circumstances left the passenger under "no compulsion" to accept the ride or the frisk it entailed, the court held that the passenger's gesture communicated his consent to the search. *See id.* at 351; *see also O'Hara*, 27 S.W.3d at 553 ("[I]f an individual volunteers to ride in a police car, he may be subjected to a routine pat-down search before being allowed in the car.").

But where the officer instead couches the issue as a command or directive to comply with a search, verbal or nonverbal responses that do not clearly indicate consent—rather than mere acquiescence—are seldom deemed manifestations of

consent. For instance, this court rejected a claim of consent to a prolonged detention where the officer told the appellee that he would be conducting a dog-sniff search and instructed the detainee to start his truck, turn the fan on high, roll up the windows, and stay in the vehicle, and the appellee responded "okay" as he complied. *State v. Marino*, No. 2-01-474-CR, 2003 WL 851953, at *2 (Tex. App.—Fort Worth Mar. 6, 2003, pet. ref'd) (mem. op., not designated for publication). We held the officer's framing of the issue as a command rather than a request for consent weighed against a finding of consent; "[b]y stating his intentions and instructing appellee on how to cooperate rather than requesting permission to prolong the detention for the canine sweep, Officer Sheffield indicated to appellee that he had the authority to conduct the canine sweep without appellee's consent." *Id.* We concluded that the appellee's response was nothing more than mere acquiescence to a claim of lawful authority. *Id.*

Likewise, the district court attached weight to the absence of a request for consent in *United States v. Curtis*, 490 F. Supp. 3d 1183, 1196 (S.D. Tex. 2020), *appeal dismissed*, No. 20-20570, 2020 WL 9425159 (5th Cir. Nov. 12, 2020). "One thing that didn't happen is obvious—no officer or other personnel on the scene ever asked Curtis for permission to enter his home." *Id.* "That failure of specific request weighs against a finding of voluntary consent here." *Id.* In the absence of any request for consent, the court held that appellant's "equivocal" interactions with officers did not demonstrate his implied consent to the search. *Id.*

15

Here, no witness testified that Massey consented to the search, and there were no written or verbal indicia of consent. The State's argument for consent rests solely on Massey's gesture of turning around. But the way that Officer Lukowsky elicited that gesture undermines any finding of consent. About two minutes into the detention, Officer Lukowsky said to Massey, "You don't have any weapons on you, do you?" Massey replied, "No." Officer Lukowsky then directed Massey, "Just go ahead and turn around, I'm going to pat you down just for my safety." Massey initially turned around and raised his arms slightly. Officer Lukowsky did not request consent to search Massey. Rather, he infused the issue with compulsion, directing Massey to turn around and comply with a search of his person. The officer's framing of the issue militates in favor of a determination that Massey's response was merely an acquiescence to an assertion of lawful authority.

The State's case for consent only grows thinner when considering the rest of the encounter. As soon as Officer Lukowsky attempted to pat him down, Massey put his hand in his pocket and began pulling away. Officer Lukowsky gripped his arm, but Massey ripped free, backed away, and continued to defy the officer's attempts to detain and search him until he was tased. Massey's struggle against the search was so vigorous that, on appeal, the State now argues that Massey could and should have been charged with a resisting offense. A struggle is not a hallmark of genuine consent to a search.[2]

---

[2]Indeed, the case for consent was so slight that the State did not even think to argue at the suppression hearing that Massey consented to the search. The trial court,

16

Even viewing the record in the light most favorable to the prosecution, then, a rational trier of fact could not conclude by clear and convincing evidence that Massey voluntarily consented to the search. *See Meekins*, 340 S.W.3d at 459 n.24. In the absence of a warrant or any other exception to the warrant requirement, the search was per se illegal. *See id.* at 458.

## V. ATTENUATION

The State argues in the alternative that even if the search was illegal, any taint from the illegality was attenuated by Massey's subsequent criminal conduct. According to the State, Massey committed two offenses when he broke from Officer Lukowsky's grip and moved backward: resisting a search and evading detention. *See* Tex. Penal Code Ann. §§ 38.03–.04. The State submits that these intervening offenses vitiate the connection between the illegal pat-down and the discovery of the methamphetamine, such that the trial court properly denied suppression.

The principal judicial remedy to deter Fourth Amendment violations is the exclusionary rule, which often requires trial courts to exclude unlawfully seized evidence in a criminal trial. *Utah v. Strieff*, 579 U.S. 232, 237, 136 S. Ct. 2056, 2061 (2016). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of

---

in its initial oral findings, did not find that Massey consented to the search. It was only when the case reached the appeal stage that the State came up with this ex post facto justification. When we abated and remanded the case to the trial court for written findings and conclusions, the trial court simply approved the State's proposed finding that Massey consented to the search.

an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Id.*, 136 S. Ct. at 2061 (internal quotation omitted).

Appended to this rule, there are doctrines that "refine the situations in which the illegally obtained evidence can be admitted at or excluded from trial." *Day v. State*, 614 S.W.3d 121, 128 (Tex. Crim. App. 2020). One is the attenuation doctrine. *Id.* Under this doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Strieff*, 579 U.S. at 238, 136 S. Ct. at 2061 (internal quotation omitted).

To determine whether the attenuation doctrine applies, we ask "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *State v. Jackson*, 464 S.W.3d 724, 731 (Tex. Crim. App. 2015). Neither the Fourth Amendment exclusionary rule nor our own statutory exclusionary rule, embodied in Article 38.23(a) of the Texas Code of Criminal Procedure, requires the suppression of evidence that was not "obtained" as a result of some illegality. *Id.* Depending on how removed the actual attainment of the evidence is from the illegality, the ordinary person may not consider that evidence to have been

18

"obtained" by that illegality. *Wehrenberg v. State*, 416 S.W.3d 458, 469 (Tex. Crim. App. 2013).

Three factors guide our attenuation analysis. *Strieff*, 579 U.S. at 239, 136 S. Ct. at 2061–62. First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. *Id.*, 136 S. Ct. at 2062. Second, we consider the presence of intervening circumstances. *Id.*, 136 S. Ct. at 2062. Third, we examine the purpose and flagrancy of the official misconduct. *Id.*, 136 S. Ct. at 2062.

The presence or absence of an intervening circumstance dictates which of the two remaining factors should carry greater significance:

> When police find and seize physical evidence shortly after an illegal stop, in the absence of the discovery of an outstanding arrest warrant in between, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights. Under this scenario, temporal proximity is the paramount factor. But when an outstanding arrest warrant is discovered between the illegal stop and the seizure of physical evidence, the importance of the temporal proximity factor decreases. Under this scenario, the intervening circumstance is a necessary but never, by itself, wholly determinative factor in the attenuation calculation, and the purposefulness and/or flagrancy of the police misconduct, *vel non*, becomes of vital importance.

*Jackson*, 464 S.W.3d at 731–32 (quoting *State v. Mazuca*, 375 S.W.3d 294, 306–07 (Tex. Crim. App. 2012)).

The courts are not of one mind as to whether and when a subsequent criminal offense, committed after an illegal seizure or search, will operate as an intervening

circumstance. But the disparity in the decisions appears to have much to do with the gravity of the subsequent offense and the degree to which it is an expectable result of illegal police action. *See State v. Alexander*, 595 A.2d 282, 285 (Vt. 1991) (reasoning that not all subsequent crimes will act as intervening circumstances, only ones sufficiently "serious" to be "distinct"). The more serious and unforeseeable the subsequent offense is, the more apt it is to be deemed an intervening circumstance that tends to free the resulting evidence from any taint. *See United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014) (collecting examples). For example, in *Matienza v. State*, officers attempted to detain the appellant on drug charges, and he brandished a gun and pointed it at an officer. *See* 699 S.W.2d 626, 626–27 (Tex. App.—Dallas 1985, pet. ref'd). The ensuing searches revealed cocaine. *Id.* at 627. The court of appeals rightly upheld the denial of the appellant's motion to suppress this evidence, reasoning that his extreme act served as an intervening circumstance that tended to purge the resulting evidence of any taint. *Id.* at 628.

But conversely, if the crime is petty and relatively predictable as a product of an unlawful detention or search, the evidence revealed is better viewed as an extended derivation of the illegal police action. "Incriminating admissions and attempts to dispose of incriminating evidence are common and predictable consequences of illegal arrests and searches, and thus to admit such evidence would encourage such Fourth Amendment violations in future cases." LaFave, *Crime committed in response to illegal arrest or search as a fruit*, 6 Search & Seizure § 11.4(j) (6th ed.). The supreme courts of Delaware

20

and New Hampshire have held that milder cases of resisting arrest did not constitute intervening circumstances. *Jones v. State*, 745 A.2d 856, 872–73 (Del. 1999); *State v. Beauchesne*, 868 A.2d 972, 982–83 (N.H. 2005); *accord Commonwealth v. Augustus*, No. 1603-15-1, 2016 WL 1002095, at *6–7 (Va. Ct. App. Mar. 11, 2016) (reaching a similar conclusion, reasoning that "a non-violent or non-threatening crime" was less apt to be deemed an intervening circumstance). Other courts have held that simply running away from the detaining officers or attempting to discard evidence will not necessarily dissipate the taint. *United States v. Gaines*, 668 F.3d 170, 174–75 (4th Cir. 2012); *Brodie*, 742 F.3d at 1063; *Johnson v. United States*, 253 A.3d 1050, 1058 (D.C. 2021) ("Here, appellant's flight, on foot, did not constitute . . . a serious risk to the public safety when compared to the cases cited by the government."); *State v. Owens*, 992 N.E.2d 939, 942–43 (Ind. Ct. App. 2013); *Thornton v. State*, 214 A.3d 34, 56–57 (Md. 2019).

Massey's alleged offenses—resisting search and evading detention on foot—fall into this latter category. Massey was not violent, he had no weapons, and his alleged offenses consisted largely of trying to free himself from the grip of an illegal search. Because neither offense marked a severe departure from the common, if regrettable, range of responses to an unlawful frisk, they do not constitute intervening circumstances.

In the absence of intervening circumstances, the "physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights. Under this scenario, temporal

21

proximity is the paramount factor." *Jackson*, 464 S.W.3d at 732. Only a minute passed between the illegal frisk and the time that Massey was tased. Another minute passed between the tasing and the discovery of the methamphetamine.

Because the dominant factor of temporal proximity strongly favors suppression, we hold that Massey's alleged offenses during the detention did not attenuate the taint of Officer Lukowsky's illegal frisk.

## VI.    PLAIN VIEW

The lack of attenuation for this Fourth Amendment violation also addresses another of the State's arguments against suppression: the State maintains that the evidence is admissible because Officer Lukowsky discovered it in plain view.

Three requirements must be met to justify the seizure of an object in plain view: (1) law enforcement officials must lawfully be where the object can be plainly viewed; (2) the incriminating character of the object in plain view must be immediately apparent to the officials; and (3) the officials must have the right to access the object. *State v. Betts*, 397 S.W.3d 198, 206 (Tex. Crim. App. 2013). In determining whether the officer had a right to be where he was, the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. *Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim. App. 2000).

As we have determined, Officer Lukowsky violated the Fourth Amendment en route to the vantage point where he discovered the methamphetamine. "[I]n light of the unjustified pat[-]down, the State cannot invoke the 'plain view' doctrine . . . ."

22

*State v. Bishop*, No. 13-16-00322-CR, 2017 WL 1089681, at \*6 (Tex. App.—Corpus Christi–Edinburg Mar. 23, 2017, no pet.) (mem. op., not designated for publication); *see State v. Rodriguez*, 529 S.W.3d 81, 90–91 (Tex. App.—Eastland 2015), *aff'd*, 521 S.W.3d 1 (Tex. Crim. App. 2017); *Paulea v. State*, 278 S.W.3d 861, 867 n.5 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). We reject the State's plain-view claim.

## VII. HARM

Having found error, we now turn to the question of harm. The admission of evidence that was obtained in violation of the Fourth Amendment is an error of constitutional magnitude. *Hernandez v. State*, 60 S.W.3d 106, 106 (Tex. Crim. App. 2001). Because the error is constitutional, Rule 44.2(a) requires us to reverse the conviction unless we determine beyond a reasonable doubt that the trial court's denial of suppression did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a); *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016). In applying the "harmless error" test, we ask whether there is a "reasonable possibility" that the error might have contributed to the outcome. *Love*, 543 S.W.3d at 846. If the denial of the motion to suppress contributed in some measure to the State's leverage in the plea-bargaining process and may have contributed to the appellant's decision to relinquish his constitutional rights of trial and confrontation, we cannot conclude beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *Chidyausiku v. State*, 457 S.W.3d 627, 631–32 (Tex. App.—Fort Worth 2015, pet. ref'd); *see Holmes v. State*, 323 S.W.3d 163, 174 (Tex. Crim. App. 2010) (op. on reh'g).

23

As to the probation revocation, the State offered no evidence that Massey violated the terms of his community supervision aside from the methamphetamine that the trial court erroneously declined to suppress. *See Pinkston v. State*, No. 02-14-00041-CR, 2015 WL 1262919, at *4 (Tex. App.—Fort Worth Mar. 19, 2015, pet. ref'd) (mem. op., not designated for publication) (concluding that there was harm because "the cocaine found on Pinkston during Galbraith's illegal detention is the only evidence that Pinkston possessed cocaine"). As to Massey's decision to plead guilty to the separate possession offense, the State's victory-in-error at the suppression hearing gave the State the ability to offer an essential piece of evidence in a prosecution for possession of a controlled substance: the controlled substance itself. *See Falero v. State*, No. 02-19-00205-CR, 2020 WL 1949018, at *1 n.3 (Tex. App.—Fort Worth Apr. 23, 2020, pet. ref'd) (mem. op., not designated for publication) ("If the State's primary evidence in support of Falero's conviction—the methamphetamine—should have been suppressed, then Falero would be entitled to a reversal of the trial court's judgment . . . ."). The error had an evident suasive effect on Massey's decision to plead guilty, given that he decided to enter this plea shortly after the denial of his motion to suppress. *See Wheeler v. State*, 573 S.W.3d 437, 446 (Tex. App.—Fort Worth 2019) ("Wheeler pleaded guilty only after the trial court denied his motion to suppress,

indicating that the trial court's denial was a factor in his decision to plead guilty."), *aff'd*, 616 S.W.3d 858 (Tex. Crim. App. 2021).[3]

We therefore cannot conclude beyond a reasonable doubt that the erroneous denial of suppression did not contribute to Massey's revocation and decision to plead guilty. We sustain Massey's sole point.

## VIII. CONCLUSION

We reverse the judgments and remand to the trial court for further proceedings consistent with this opinion.

/s/ Wade Birdwell

Wade Birdwell
Justice

Publish

Delivered: December 9, 2021

---

[3]The State argues that any constitutional error is harmless because, on appeal, Massey has failed to challenge the trial court's finding of true as to the State's allegation that he failed to report to the probation department as required. However, in our evaluation of harm, we take into account any and every circumstance apparent in the record that logically informs an appellate determination whether beyond a reasonable doubt that particular error did not contribute to the conviction or punishment. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). One of those circumstances must be that Massey pleaded not true to this allegation, but that the State did not offer *any* evidence concerning Massey's alleged failure to report. Considering the complete lack of evidence to establish this ground, Massey's alleged failure to report does not mitigate the harm that he suffered due to the erroneous denial of his motion to suppress.